FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

SEP 2 9 2005

DAVID J. MALAND, CLERK
BY
DEPUTY_____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| ENTECH DESIGN, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 4:05 CW 378 |
| V. | § | |
| | § | Judge Schell |
| ENDRESS+HAUSER CONDUCTA | § | |
| GmbH+Co.KG, ENDRESS+HAUSER | § | |
| CONDUCTA, INC. AND | § | |
| WEDGEWOOD ANALYTICAL, INC. | § | |
| | § | Jury Trial Demanded |
| Defendants. | § | |

### *Plaintiff's Original Complaint*

**TO THE HONORABLE COURT:**

NOW COMES Plaintiff, ENTECH DESIGN, INC., complaining of Defendants, ENDRESS+HAUSER CONDUCTA GmbH+Co.KG, ENDRESS+HAUSER CONDUCTA, INC. and WEDGEWOOD ANALYTICAL, INC., respectfully showing the Court as follows:

#### *Parties.*

1. ***Plaintiff, Entech Design, Inc. ("Entech")***. Entech is a Texas corporation with a principal place of business in Denton, Texas.

2. ***Defendant, Endress+Hauser Conducta GmbH+Co.KG ("Endress Germany")***. Endress Germany is a business entity having its principal place of business in Gerlingen, Germany and upon information and belief, exists by virtue of the laws of Germany.

3. On information and belief, based on statements it has made on its Internet Web page, Endress Germany is part of Endress+Hauser Group.

4.      On information and belief, based on statements it has made on its Internet Web page, www.endress.com, Endress+Hauser Group is a Swiss holding company that manages a group of business entities, including but not limited to Defendant Endress Germany, Defendant Endress+Hauser Conducta, Inc., and Defendant Wedgewood Analytical, Inc.  On information and belief, these entities compete with non-affiliated entities in the United States and worldwide in the field of measurement technology and automation for industrial process engineering.

5.      In addition, on information and belief, Endress Germany is the parent company of, or otherwise related to Endress+Hauser Conducta, Inc.

6.      Further, on information and belief, Endress Germany is also the parent company of, or otherwise related corporately to Wedgewood Analytical, Inc.

7.      Endress Germany has done business with a Texas resident out of which this action arises by, among other things, negotiating and/or entering into contract(s) with a Texas resident to be performed by at least one party in the State of Texas.

8.      In addition, on information and belief, Endress Germany has engaged in business and other conduct in the State of Texas out of which this action arises by, among other things, selling its products in Texas with purposeful direction and in a substantial volume.  In fact, on information and belief, it has a Southwest Regional Center in Houston, Texas and sales representatives who work throughout the State of Texas.

9.      Endress Germany has also committed tortious conduct, in whole or part in, or directed to Texas, based upon information and belief.

10.     Endress Germany does not maintain a registered agent for service of process in Texas.

11.     Accordingly, under Texas Civil Practice and Remedies Code § 17.044, Endress Germany is deemed to have appointed the Texas Secretary of State as its agent for service, and may be served by serving the Texas Secretary of State with two copies of process along with the accompanying copies of this Complaint with the instruction to forward same by certified mail, return receipt requested, to:

> Wolfgang Babel
> Manager and/or Chief Executive Officer and Director
> Endress+Hauser Conducta GmbH+Co.KG
> Dieselstraße 24
> 70839 Gerlingen
> Germany

12.     ***Defendant, Endress+Hauser Conducta, Inc. ("Endress USA").*** Endress USA is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 2360 Endress Place, Greenwood, Indiana 46143.

13.     Endress USA is part of the Swiss entity, Endress+Hauser Group.

14.     On information and belief, Endress USA is a subsidiary or affiliate of Endress Germany.

15.     Further, on information and belief, Endress USA constitutes the operation of Endress Germany in the United States.

16.     Further, on information and belief, Endress USA is a related entity to Wedgewood Analytical, Inc.

17.     Endress USA has done business with a Texas resident out of which this action arises by, among other things, negotiating and entering into contract(s) with a Texas resident to be performed by at least one party in the State of Texas.

18.     In addition, on information and belief, Endress USA has engaged in business and other conduct in the State of Texas out of which this action arises by, among other things, selling its products in Texas with purposeful direction and in a substantial volume.

19.     Endress USA has also committed tortious conduct in whole or part in, or directed to Texas, based upon information and belief.

20.     Endress USA maintains neither a regular place of business nor a registered agent for service of process in Texas.

21.     Accordingly, under Texas Civil Practice and Remedies Code § 17.044, Endress USA is deemed to have appointed the Texas Secretary of State as its agent for service, and may be served by serving the Texas Secretary of State with two copies of process along with the accompanying copies of this Complaint with the instruction to forward same by certified mail, return receipt requested, to:

> Loren Puck
> Endress+Hauser Conducta, Inc.
> 2350 Endress Place
> Greenwood, Indiana 46143;

to its Registered Agent for Service in Delaware:

> The Corporation Trust Company
> Corporation Trust Center
> Registered Agent for Endress+Hauser Conducta, Inc.
> 1209 Orange Street
> Wilmington, Delaware 19801;

and to its Chief Executive Officer:

> Wolfgang Babel
> Endress+Hauser Conducta, Inc.
> 2350 Endress Place
> Greenwood, Indiana 46143.

22. ***Defendant, Wedgewood Analytical, Inc. ("_Wedgewood_").*** Wedgewood is a California corporation with a principal office at 4123 E. La Palma Avenue, Suite 200, Anaheim, California 92801-1813.

23. It is also part of the Swiss entity, Endress+Hauser Group, and on information and belief, related to Endress Germany and Endress USA.

24. Wedgewood has done business with a Texas resident out of which this action arises by, among other things, negotiating and entering into contract(s) with a Texas resident to be performed by at least one party in the State of Texas.

25. In addition, on information and belief, Wedgewood has engaged in business and other conduct in the State of Texas out of which this action arises by, among other things, selling its products in Texas with purposeful direction and in a substantial volume.

26. Wedgewood has also committed tortious conduct in whole or part, in or directed to Texas, based on information and belief.

27. Wedgewood maintains neither a regular place of business, nor a registered agent for service of process in Texas.

28. Accordingly, under Texas Civil Practice and Remedies Code § 17.044, Wedgewood is deemed to have appointed the Texas Secretary of State as its agent for service, and may be served by serving the Texas Secretary of State with two copies of process along with the accompanying copies of this Complaint with the instruction to forward same by certified mail, return receipt requested, to:

Wolfgang Babel, Chairman and/or President
Wedgewood Analytical, Inc.
4123 E. La Palma Avenue Suite 200
Anaheim, California 92801-1813;

and to its Registered Agent for Service in California:

Ian Tribick, Registered Agent
Wedgewood Analytical, Inc.
4123 E. La Palma Ave Ste 200
Anaheim, California 92801-1813.

### *Jurisdiction and Venue.*

29.     This is an action seeking, among other things, a declaratory judgment, injunctive

relief and damages arising out of Defendants' breach of contract, promissory estoppel, fraud and

unfair competition under 15 U.S.C. § 1051 *et seq.* (the "Lanham Act").

30.     As a result, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

31.     Moreover, this Court has jurisdiction over the related common law and state claims

pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

32.     Further, this Court has jurisdiction over this case under 28 U.S.C. § 1332 because

there is complete diversity between Plaintiff Entech and all the Defendants, Endress Germany,

Endress USA, and Wedgewood, and the amount in controversy exceeds the sum or value of

$75,000.00, exclusive of interests and costs.

33.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400.  Among

other things, a substantial part of the events or omissions giving rise to these claims occurred in this

judicial district, and Defendants are subject to personal jurisdiction here, and may be found in this

judicial district.

34.     The Court has personal jurisdiction over each of the Defendants, as set out above.

### *Facts.*

35.     Entech re-alleges and incorporates by reference here each of the facts and allegations contained in the preceding paragraphs in this Complaint.

36.     ***Entech.*** Entech manufactures highly innovative sonar interface detection instruments designed to measure the level of toxic or dangerous sediment in liquids used in water treatment and in the power industry, among other things.

37.     Entech is a leader and innovator in its industry.

38.     Entech's equipment is designed specifically for harsh industrial applications in which it is exposed to high temperatures, harsh chemicals and a wide range of physical properties of materials in process liquids.

39.     Its instruments use fixed-point transducers (in single and multiple sensor configurations) for simple detection and measurement.

40.     Its instruments also use remotely controlled scanning transducers to produce three dimensional images of sediment in power industry bottom ash hoppers and slag tanks.

41.     For example, Entech manufactures a premier line of process analysis instruments for detecting sludge levels in the full range of water and waste water clarifiers and thickeners. These Entech instruments use high frequency underwater acoustics and advanced microprocessor technology, and are known by Entech's "Binminder" trademark.  *See* Ex. 1 (Binminder product brochure).

42.     At all times relevant to the claims in this action, Entech owned the technical information relating to its Binminder products, including but not limited to:

        Binminder know-how, understanding, and documentation;

> Binminder-related computer hardware know-how;
>
> Binminder-related computer software programs;
>
> Binminder-related computer source codes;
>
> The know-how for integrating the Binminder system into other systems, including but not necessarily limited to systems used for products manufactured and/or sold by Defendants;
>
> Binminder-related algorithm know-how sufficient to implement the Binminder functionality, manufacturing processes; and
>
> Binminder-related know-how necessary to manufacture the Entech Sensor for integration into other systems, including but not necessarily limited to systems relating to products manufactured and/or sold by Defendants and other entities related to Defendants through Endress+Hauser Group.

43.     Entech also manufactures process analysis instruments, including but not limited to, its EPA 2000 Expansion Pro Analyzer 2000, its MAPS 20/20 Material Acoustical Profile System and associated Ash Tracker, and its 9300-ETS Effluent Turbidity Sensor.

44.     Entech owns technical information relating to these products similar to that set out above in connection with Binminder.

45.     ***Endress Germany.***  On information and belief, based on statements it has made on its Internet Web page, Endress Germany competes in the United States and worldwide in the field of measurement technology and automation for industrial process engineering.

46.     Endress Germany claims to specialize in products used for liquid analysis for the environmental and process industry.

47.     Endress Germany also claims to employ more than 400 employees around the world and to have important production sites in Waldheim, Germany and Anaheim, California.

48.     For several years, its representatives have dealt directly with Entech representatives for purchases for resale and installation of certain Entech equipment, instruments and systems.

49.     As more fully set out below, its representatives dealt directly with Entech representatives in connection with the matters set out in this Complaint.

50.     ***Endress USA.***     Endress USA competes in the United States in the field of measurement technology and automation for industrial process engineering.

51.     On information and belief, Endress USA is Endress Germany operating in the United States.

52.     On information and belief, based on its Internet Web page, Endress USA specializes in products used for liquid analysis for the environmental and process industry.

53.     On information and belief, based on its Internet Web page, Endress USA provides measurement instrumentation and automation solutions for industrial process engineering.

54.     Endress USA touts a wide range of sensors, instruments, systems and services used for level, flow, pressure, temperature analysis and recording, including but not limited to analysis instruments using the Liquisys S trademark.

55.     On information and belief, Endress USA customers come primarily from the chemical, petrochemical, food and beverage, water and wastewater, paper energy and oil and gas industry.

56.     ***Wedgewood.***     On information and belief, Wedgewood is also part of the Endress+Hauser Group, and it competes in the United States in the field of measurement.

57.     Wedgewood claims to manufacture or market analysis instruments that compete or complement with those manufactured by Entech.

*Defendants constitute a single business enterprise.*

58.     On information and belief, Defendants each share common ownership, common officers, common directors, common management, common personnel, common offices and facilities.

59.     Further, on information and belief based on statements Endress+Hauser Group has made on its Internet Web page, each Defendant is part of, and is owned and managed by Endress+Hauser Group.

60.     On information and belief, Endress Germany is the parent company of, or otherwise related to Endress USA.

61.     On information and belief, Endress Germany is also the parent company of, or otherwise related corporately to Wedgewood.

62.     All Defendants are involved in the same business and on information and belief, pursue common, mutual business goals.

63.     Defendants each freely use the Endress facilities in, among other places, Germany, Indiana, and California.

64.     Wolfgang Babel and others serve in a decision-making capacity for Endress Germany and Endress USA and by all appearances, also do so for Wedgewood.

65.     Moreover, on information and belief, any distinctions between the Defendants is artificial and superficial with respect to the matters set out in the Complaint, and the three Defendants acted together to perpetuate a fraud against Plaintiff.

66.     Specifically, on information and belief, Defendants are so dominated and controlled by Endress+Hauser Group or one of the other Defendants that none in reality constitute a separate and distinct corporate entity.

67.     As a result, on information and belief, Defendants should be regarded as a single business enterprise, or alternatively the alter egos of one another.

### *In 2000, Endress Germany expressed interest in acquiring Entech's Binminder technology.*

68.     For some time, Endress Germany has manufactured analysis instruments under the Liquisys S trademark.

69.     Endress USA markets and services the Liquisys S product in the United States.

70.     Prior to November 2000, Endress Germany claimed it was interested in purchasing certain technical information and ongoing technical support from Entech relating to Entech's Binminder and other products.

71.     In fact, in April 2000, Wolfgang Babel (Manager for Endress Germany, among other positions he holds with various Defendants) and Franz Winter (Marketing Director for Endress Germany) visited Entech's facilities in Denton, Texas to discuss with Vince King, an Entech principal, the various ways Endress could acquire technological information relating to Entech's Binminder product line.

72.     Based on the statements of these representatives, Endress Germany was purportedly interested in integrating Entech's technical information and functionality relating to its Binminder product into Endress' Liquisys S.

73.     The resulting product was to be known as the Liquisys S Ultrasonic Product and System.

74.     Throughout the spring of 2000, Entech and Endress Germany representatives continued negotiating through written correspondence.

75.     For example, in May 2000, King wrote Babel and Winter proposing specific terms for a technology transfer and business relationship between Entech and Endress Germany.

76.     A few days later Babel responded making some alternative suggestions and encouraging more discussion.

77.     In June of 2000, King traveled to Endress' facility in Gerlingen, Germany to work out the details of a Binminder-related technology transfer agreement with Babel and Klaus Metzger (Endress Germany's Chief Financial Officer).

78.     Immediately after returning home from the June 2000, meeting in Germany, King sent Babel a proposed agreement.

79.     Babel responded by indicating that he liked King's concepts, and that he would turn over to Endress Germany attorneys King's proposal so they could draft a formal agreement.

### *The Technology Transfer Agreement.*

80.     The result of these discussions is the November 29, 2000, Agreement between Entech and Endress USA, a true copy of which is attached as Ex. 2 (the "Endress Agreement").

81.     Under the Endress Agreement, Entech "supplie[d], assign[ed], and convey[ed]" to Endress USA its technical information necessary to implement Binminder functionality into Endress' Liquisys S Menue Structure.

82.     According to the Endress Agreement, Entech's technology transfer was "irrevocable."

83.     In addition, under the Endress Agreement, Entech was required to transfer its related written documentation describing the Entech System, computer hardware know-how (including manuals, warranties, computer board descriptions, specifications and blue prints, and all software), know-how pertaining to the Binminder functionality (including source code, ongoing research and development, software information and programs) and algorithm know-how as developed (as well as it continuous algorithm development).

84.     Under the Endress Agreement, Entech also provided Defendants special training in connection with its technology.

85.     As an inducement to Entech, the Endress Agreement specifically states that Entech would continue to have the right to use its technical information, under certain restrictions.

86.     Further, under the Endress Agreement, Entech was entitled to receive promptly the details of any improvements to the technical information (for possible use in noncompeting products, but the technical information and the right to manufacture the Liquisys S Ultrasonic Products was owned by Endress).

87.     As a further inducement to Entech, the Endress Agreement required certain royalties to be paid to Entech for sales of the integrated product, and provides that Entech was to receive special pricing so it could profit itself from selling the integrated product and other Endress products.

88.     Further, according to the Endress Agreement, any failure by Defendants to adapt Entech technical information to the development of a new Liquisys S product that would integrate Binminder functionality and be known as the Liquisys S Ultrasonic Product and System, or failure

to bring to market a product resulting from that integration within 48 months would constitute a breach of the Endress Agreement.

89.     Even though Endress USA is nominally the contracting party in the Endress Agreement, even after the agreement was signed, Endress representatives acted as if there was no distinction between Endress USA and Endress Germany (just as they had during negotiations, as set out above).

90.     For example, in January 2001, Babel, Winter and Detlef Wittmer (Head of Engineering & Production for Endress Germany, among other things), and Godehard Gauf (a design engineer employed by Endress Germany) met with Entech representatives in Denton, Texas over the course of a week to receive Entech's technical information that is the subject of the Endress Agreement.

91.     In addition, at that time, these Endress Germany representatives were provided hard copies of documents setting out the complete product design documentation.

92.     They also received several days of training in Denton, Texas on all the aspects of Entech's hardware and software and all of Entech's proprietary information relating to design and operation of Entech's Binminder products.

93.     Similarly, in April 2001, King and Randy Minnis (another Entech principal) traveled to Gerlingen, Germany to provide Endress Germany representatives further training on the Entech Binminder products.

94.     Then, when the promised new product development project at Endress was delayed, Gauf at Endress Germany apologized to King, an admission that Endress Germany had an obligation to develop the integrated product.

*Plaintiff's Original Complaint*
F:\STOR\DRC\ENTECH\PLDGS\COMPL4.WPD

95.     Endress USA and Endress Germany acted as if Endress Germany had the right to the technical information under the Endress Agreement and like there was no real distinction between Endress USA and Endress Germany for purposes of the agreement.

### *Defendants neither developed, nor marketed an integrated product as required.*

96.     By the end of the four year term of the Endress Agreement, Defendants had not developed, marketed, or sold the contemplated integrated product.

97.     As a result, Defendants had failed to live up to their obligations under the Endress Agreement, to Entech's harm.

98.     In fact, Entech, under the agreement, was entitled to, among other things, terminate the agreement after four years by paying Endress USA one dollar.

99.     Even so, Defendants induced Entech to continue the technology transfer beyond the November 2004 termination date of the Endress Agreement, and Babel and Metzger continued to meet and correspond with King on that subject.

100.    In early November 2004, shortly before the end of the four year term of the Endress Agreement, Babel indicated for the first time that Defendants were interested in a) purchasing outright **all** Entech's technical information, b) hiring certain high level Entech employees and principals and c) ultimately winding down the operations of Entech entirely (and thereby eliminating Entech, a healthy potential competitor).   Defendants even discussed ultimately merging all of Entech's then-existing sales force to become the foundation of a U.S. water and wastewater sales group for Defendants, integrating formerly competing groups. These were completely new concepts.

101.    Based on these representations, from November 2004, Entech worked toward that end with good faith negotiations with Defendants.

102.   For example, on November 15, 2004, King wrote Babel with a list of essential points for any purchase and wind-down.

103.   Defendants' purported interest in the Entech purchase and wind-down induced Entech to ignore the fact that on November 29, 2004, the four year term in which Defendants were to develop and market the integrated product expired, and that there was no integrated product existing, and to ignore the fact that Entech was entitled to terminate the agreement.

104.   Then, in December 2004, King and Minnis met with Babel and Metzger at Wedgewood's facilities in California.

105.   At that meeting, Babel and Metzger stated that the purchase offer would include a payment for the Entech technology and an employment relationship with King and Minnis.

106.   King and Babel continued their discussions by email, and on February 24, 2005, King and Minnis met Babel and Metzger again in Anaheim, California at the Wedgewood facilities. This time, Babel also brought Steven Plopper, Defendants' attorney, without informing King and Minnis in advance.

### *The "Term Sheet."*

107.   During the day-long February 24, 2005 meeting, Defendants' attorney prepared a "Term Sheet" setting out the agreement among the parties. This Term Sheet was executed at the end of the meeting by all parties (and without Entech having the benefit of counsel). A true copy of the Term Sheet is attached as Ex. 3.

108.   The Term Sheet states that it "represents the basis upon which [Wedgewood] will acquire certain technology, know-how, customers, intellectual property and other proprietary information from [Entech] and from [Entech's principals.]" *See* Ex. 3.

109. The Term Sheet further states that it is "***binding upon the Parties*** as an embodiment of the negotiations that have taken place between the Parties to effect the Technology Transfer and the Employment [of Entech principals by Defendants] and ***constitutes the agreement of the Parties*** to be further defined in a 'Definitive Technology Transfer Agreement' and in Employment Contracts and Non-Competition Agreements . . . ***to be entered into by the Parties***, subject to the advice of the Parties respective Counsel. It being the intention of the Parties that this Term Sheet represents the final negotiation between the Parties and ***is binding*** as to the business terms contained herein; . . ."

*See* Ex. 3.(emphasis added).

110. The Term Sheet sets out in a paragraph titled "Technology Transfer" as follows:

Entech agrees to supply, assign, transfer and convey to Wedgewood all its rights, title and interest in and to all technical information, including but not limited to written memoranda, computer hardware and software, know-how, manuals, computer board designs and descriptions, specifications, blueprints, all software know-how including source codes, algorithm know-how as developed and in development, all ongoing research and development, software information and programs as same relates to the in-liquid interface level detector known as "Binminder", all other products based on the Binminder Platform including the Expansion Pro Analyzer 2000, the Ash Tracker, and the Effluent Turbidity Sensor, all other sensors used in association with these products whether in production or in development and includes Entech's continuous algorithm development. The Technology Transfer agreed herein is irrevocable and is effective upon Entech's receipt of the initial payment. An earlier technology transfer of the Binminder Technology took place in 2000 between Entech and Endress+Hauser Conducta, Inc. under a Technology Transfer Agreement dated November 29, 2000. Such Agreement will be cancelled and Endress+Hauser Conducta Inc. will convey such Binminder Technology to Wedgewood so that there is a merger of the existing technology under one ownership.

*See* Ex. 3.

111. Further, according to the Term Sheet, Wedgewood agreed:

     i.     to pay a total of $1,255,000.00 for the Technology;

     ii.    to pay Entech principals King and Minnis a collective total of $245,000.00 for entering into a standard non compete agreement for four years;

iii.    to enter into a standard employment agreement under which it would pay King an additional $140,000.00 per year, a significant bonus and significant executive benefits for serving as Manager of the Technology Transfer and in another executive capacity thereafter; and

iv.    to enter into a standard employment agreement under which it would pay Minnis $92,000.00 per year with a significant bonus and significant executive benefits to serve as its Regional Sales Manager.

*See* Ex. 3.

112.    The Term Sheet provided for a 90 day period, during which Entech would wind-down its entire operation and states that the Parties intend that "Entech will cease all business activities that are in any way competitive with Wedgewood . . . " *See* Ex. 3.

113.    Entech was to continue manufacturing products only for Endress and then, only until manufacturing operations for those Entech products could be undertaken at the Wedgewood facility.

114.    Endress' attorney represented that the more definitive agreement would be ready in two weeks.

115.    From February 2005, forward, based on the representations and promises of Defendants, and in a good faith effort to comply with the Term Sheet, Entech refocused its attention and resources to matters consistent with a sale of its technology and wind-down of its business.

116.    For example, based on the representations and promises of Defendants, Entech significantly cut back its normal marketing activity and cancelled sales calls, trade show attendance, and engineer sales/education visits.

117.    In fact, 2005 was the first year Entech did not attend the American Water Works Association national trade show (an essential element of its prior marketing success).

118.    In addition, Entech cancelled its booth registration at the Texas Water Conference in April 2005 (and as a result, lost the prepaid fees as well as the business development opportunity).

119.    Entech even discontinued it monthly newsletter titled "Sludge Briefs," stopped updating its web site and discontinued advertising in national trade magazines.

120.    Entech cancelled its agreement with a key sales representative in one of the fastest growing and most active territories and appointed in his place, an existing Endress representative for that important territory.

121.    Entech laid off its Engineering Manager.

122.    Entech began making subassembly and raw materials purchase decisions based on the anticipated wind-down and did not renew various blanket orders that provided for more favorable pricing.

123.    Entech reassigned a Texas sales representative to duties in support of the wind-down.

124.    Entech even discontinued all re-design and design maintenance activities.

125.    Entech made these changes based on the understanding and reasonably relying on representations that Defendants were purchasing all Entech technology, hiring its principals and paying for Entech to shut down its competing operations.

126.    Entech made these changes in a good faith effort to wind-down its operations and eliminate activities that would be inconsistent with the Term Sheet and anticipated final documents.

127.    On information and belief, Defendants were fully aware of Entech's actions and did nothing to dissuade Entech from taking such actions.

128.    In fact, in March of 2005, an Entech representative attended a three day "Sales Representative Consolidation Meeting" in Anaheim, California where Defendants presented plans for merging the Entech sales representative organization into the Defendants' organization.

129.    Throughout this time, Endress Germany was directly involved in the technology transfer and related matters.

130.    For example, in March 2005, Babel and Metzger requested and used, in a Endress Germany planning meeting, a power point presentation prepared by Minnis.  That presentation summarized Entech proprietary sales information, including sales forecasts, key projects that were "in the pipeline," including customer identification, anticipated sales and dollar amounts (typically, sales of Binminder products have an 18-36 month lead time associated with first presentation to final, consummated sale), and key points relating to business development.  Entech never would have disclosed such key, sensitive, competitive business information but for the inducement described above.

131.    On or about April 15, 2005, Metzger transmitted from Endress Germany proposed documents for the Technology Transfer Agreement, Employment Agreements for King and Minnis, and Non Compete Agreements for King and Minnis (collectively, these documents are referred to as the "Proposed More Formal Agreements").

132.    Metzger at Endress Germany was clearly managing and controlling the purchase and related agreements, notwithstanding the fact that the agreements purport to be Wedgewood documents.

133.    After this point, at Defendants' insistence, and relying on Defendants' expressed intent to purchase outright all the technology pursuant to the general terms of the draft agreements

described above, Entech began disclosing to Defendants additional and more detailed technical information, proprietary production drawings, proprietary product information, and proprietary vendor and customer information in a way that was consistent with the terms of the draft of the Technology Transfer Agreement, which were more favorable to Defendants than the Term Sheet.

134. On or about June 19, 2005, King transmitted to Metzger at Endress Germany his comments and proposed changes to the Proposed More Formal Agreements.

135. King and Minnis attempted over the next few weeks to determine from Defendants the status of the Proposed More Formal Documents, but was put off until about August 10, 2005, when Plopper, (the attorney who drafted the Term Sheet on February 24, 2005) called to say that the final documents were almost complete, but that he needed to consult with Babel at Endress Germany about the structure.

136. Plopper also indicated that Endress was, at that point, considering an outright purchase of the Entech technology without the employment agreements, but would work out an arrangement that would compensate Plaintiff generously.

137. Plopper indicated he could not be more specific about the modified, but generous terms until after he talked with Babel.

138. The clear impression given was that any substitute payment package would be at least as financially attractive overall as the Term Sheet (in fact, earlier, Babel had told them that the allocation of the total collective amount paid by Defendants under the Term Sheet was essentially immaterial, and that if needed, the amounts could be allocated differently among the various elements making up the payment).

139.     By September 7, 2005, Entech had not heard back from Plopper or anyone else connected with Defendants about the final documents or any other matter relating to the purchase.

140.     King wrote Babel indicating that if the transfer agreement was not finalized by September 15, 2005, Entech needed pricing and purchase quantities in order to be able to continue supplying equipment to Defendants for resale.

141.     On September 9, 2005, Entech received a letter from Plopper (dated September 2, 2005, postmarked September 6) on behalf of Endress Germany purportedly "formally terminat[ing] all discussion of employment and Non-Competition. . ." even though those matters are specifically set out in the Term Sheet.

142.     The letter further states that Endress Germany "continues to have keen interest in transfer of certain of the technology owned by Entech" and makes a substantially lower offer for that technology.

143.     A true copy of Plopper's September 2, 2005 letter is attached as Ex. 4.

144.     On information and belief, when Endress entered into the Endress Agreement, it intended to obtain Entech's technical information for its own benefit but knew it would not develop and bring to market the Liquisys S Ultrasonic Product and System.

145.     Further, on information and belief, when the parties entered into the Term Sheet Agreement, Defendants intended to obtain Entech's technical information for their own benefit but knew they would not develop and bring to market the Liqui Line Product Platform, and would not honor their Term Sheet obligations.

### *Entech has been severely damaged by Defendants' misconduct.*

146.     A significant amount of Entech's business related to the Binminder technology has been derived from the water/waste water industry, particularly municipalities.

147.     These Entech customers typically rely on consulting engineers for advice relating to instruments used to measure the level of toxic or dangerous sediment in liquids used in water treatment.

148.     They usually purchase new equipment in conjunction with new construction or plant upgrade projects, or as follow-on purchases originally specified in the original project plan.

149.     Thus, the purchase pattern for Entech products usually involves a lengthy lead time during which Entech representatives and independent sales representatives promote and demonstrate Entech products in the field in anticipating upcoming products.  Actual sales may take months to mature (18-36 months).

150.     Among other things, Entech's wind-down, based on Defendants promises, representations and other inducements, has negatively impacted its sales "pipeline" as well as its standing in the industry.

151.     These matters make up part of Entech's damages resulting from Defendants' misconduct.

152.     Entech has also passed up major opportunities to increase sales and redevelop its Binminder product through other avenues that may now be closed, representing damage from lost business opportunity.

### *Count 1 – Defendants Breached the Term Sheet Contract.*

153.    Entech re-alleges and incorporates by reference here each of the facts and allegations contained in the preceding paragraphs in this Complaint.

154.    Entech has performed its obligations under the Term Sheet Agreement.

155.    Defendants promised to purchase Entech's technical information and to pay Entech principals to enter into non-compete and employment agreements.

156.    Defendants breached the Term Sheet Agreement by failing to fulfill those promises, all as more fully set out above.

157.    As a result of Defendants' breach of the Agreement, Entech has suffered damages, including but not limited to, lost profits, damage to good will, and lost market opportunities.

158.    ***Attorneys Fees for Breach of Contract.***   In addition, pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code, Entech is entitled to recover their reasonable and necessary attorney's fees from Defendants for breach of the Agreement for which they now sue.

### *Count 2 – Promissory Estoppel relating to Term Sheet.*

159.    Entech re-alleges and incorporates by reference here each of the facts and allegations contained in the preceding paragraphs in this Complaint.

160.    As more specifically set out above, Defendants made certain promises to Entech.

161.    For example, Defendants promised to purchase Entech's technical information and to pay Entech principals to enter into non-compete and employment agreements.

162.    Entech fulfilled its obligations.

163.    Entech reasonably, substantially and detrimentally relied on Defendants' promises in, among other things, winding down its business as set out more fully above.

164.    It was reasonably foreseeable that Entech would do so, and would be harmed if Defendants failed to live up to its promises.

165.    Injustice can only be avoided by enforcing Defendants' promises.

166.    Defendants failed and refused to live up to its promises, proximately causing harm to Entech.

### Count 3 – Misappropriation of Confidential Information under Texas law.

167.    Entech re-alleges and incorporates by reference here each of the facts and allegations contained in the preceding paragraphs in this Complaint.

168.    Defendants have misappropriated Entech's confidential and technical information and other proprietary information relating to its Binminder product as set out above, proximately causing harm to Entech.

169.    Entech created and improved its Binminder product and its technical information through extensive time, labor, skill, and money.

170.    Defendants have obtained and used Entech's technical information relating to Entech's Binminder product and related technical information in competition with Entech, thereby gaining a special advantage ("free ride") in that competition because the Defendants are burdened with little or none of the development expense incurred by Entech.

171.    Defendants' misconduct has proximately caused commercial damage to Entech.

### Count 4 – Federal Unfair Competition.

172.    Entech re-alleges and incorporates by reference here each of the facts and allegations contained in the preceding paragraphs in this Complaint.

173.    Entech created and improved its Binminder product and its technical information through extensive time, labor, skill, and money.

174.    Defendants have obtained and used Entech's technical information relating to Entech's Binminder product and related technical information in competition with Entech, thereby gaining a special advantage ("free ride") in that competition because the Defendants are burdened with little or none of the development expense incurred by Entech.

175.    This misappropriation constitutes unfair competition under federal law.

176.    Defendants' misconduct has proximately caused commercial damage to Entech.

### *Count 5 – Fraud.*

177.    Entech re-alleges and incorporates by reference here each of the facts and allegations contained in the preceding paragraphs in this Complaint.

178.    As more fully set out above, on information and belief, Defendants misrepresented facts and failed to disclose material matters to Entech.

179.    For example, on information and belief, when Endress entered into the Endress Agreement, it intended to obtain Entech's technical information for its own benefit but knew it would not develop and bring to market the Liquisys S Ultrasonic Product and System.

180.    For further example, on information and belief, when the parties entered into the Term Sheet Agreement, Defendants intended to obtain Entech's technical information for their own benefit but knew they would not develop and bring to market the Liqui Line Product Platform, and would not honor their Term Sheet obligations.

181.    Defendants were obligated to but failed to disclose these material facts to Plaintiff.

182.    Entech reasonably relied on Defendants' misrepresentations and omissions.

183.    As a proximate result of Defendants' fraud, Entech was harmed.

### *Count 6 – Conspiracy.*

184.    Entech re-alleges and incorporates by reference here each of the facts and allegations contained in the preceding paragraphs in this Complaint.

185.    Defendants conspired together to deprive Entech of its technology and engaged in the overt acts described above, including but not limited to the breaches of contract, estoppel and fraud, proximately causing Entech's damages.

### *Count 7 – Declaratory Judgment under Federal Law (28 U.S.C. § 2201).*

186.    Entech re-alleges and incorporates by reference here each of the facts and allegations contained in the preceding paragraphs in this Complaint.

187.    There is a real and present dispute between the parties as to whether the Term Sheet is a binding agreement.

188.    For example, by virtue of their September 2, 2005, letter, Defendants erroneously claim all, or part of their obligations under the Term Sheet can be terminated.

189.    Entech understands they cannot.

190.    Entech therefore prays the Court will construe the Term Sheet in light of the facts, declare that it binds Defendants and that Defendants' attempt to terminate its obligations, to terminate portions of its obligations, or to modify its obligations by its September 2, 2005, letter or otherwise are null and void, and of no effect.

191.    Entech also prays for attorneys fees, costs or any other recovery to which they may be entitled under the Federal Declaratory Judgment Act.

### *General Allegations.*

192.    All conditions precedent have occurred, been met, been waived, or in some or any

other fashion been satisfied.

### *Demand for Jury Trial.*

193.    Pursuant to Fed. R. Civ. P. 38(b), Entech demands a trial by jury on all issues triable

of right by a jury.

### *Request for Relief.*

WHEREFORE, Entech prays for:

1.    After final trial, a Permanent Injunction against:

    any further breach of the Term Sheet Agreement by Defendants; and

    any further unfair competition by Defendants.

2.    An award of actual, and/or statutory damages and compensatory damages;

3.    A declaration that the Term Sheet is a binding agreement obligating Defendants and that the September 2, 2005, letter is ineffective to terminate, or modify Defendants' obligations under the Term Sheet;

4.    An award for reasonable and necessary attorneys' fees under Section 38.001 of the Texas Civil Practice and Remedies Code and/or under the Copyright Act;

5.    Exemplary damages;

6.    Interest, pre- and post judgment;

7.    Costs; and

8.    Such other and further relief as this Court may find appropriate.

Respectfully submitted,

_____

RICHARD L. SCHWARTZ
SBN 17869500

DAVID R. CHILDRESS
SBN 04199480

**WHITAKER CHALK SWINDLE & SAWYER, L.L.P.**
301 Commerce Street
Suite 3500
Fort Worth, Texas 76102
Telephone:      817/878-0500
Facsimile:      817/878-0501

**ATTORNEYS FOR PLAINTIFF
ENTECH DESIGN, INC.**